IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RODNEY PINKETT, )<br>  Plaintiff, )<br> )<br> v. )<br> )<br> )<br>FIRST CITIZENS BANK AND NORWEST )<br>CAPITAL INVESTMENT, INC., )<br>  Defendants. ) | No. 09 C 2365<br><br>The Honorable William J. Hibbler |

## MEMORANDUM OPINION AND ORDER

Rodney Pinkett filed this purported class-action Complaint against First Citizens Bank and Norwest Capital Investment alleging violations of various state and federal statutes that regulate the financial industry. Pinkett's claims arise from high-interest, short-term loans made to United States postal workers. Both Defendants move to dismiss.

Pinkett is an employee of the United States Postal Service. According to Pinkett, Norwest Capital Investment targets postal employees and other federal employees with advertisements offering short term loans and credit repair.[1] Pinkett obtained a loan from Norwest Capital in August 2008 in the amount of $2,000. Pinkett completed a simple, one page application to request the loan. Pinkett completed other loan documentation, including an Electronic Funds Transfer and Authorization Agreement, a document authorizing Norwest Capital to process one payment on Pinkett's debit card, a Credit Release Authorization and Supplemental Loan Application, the Postal Allotment Sign Up

---

[1] Although Norwest Capital advertised that it offered "Lower Interest rates," it charged Pinkett an annual percentage rate of 89%.

1

Form, a Norwest Capital PostalEase Authorization, and a one-page addendum to the Loan warning Pinkett of his obligations under the loan.

The Postal Allotment Sign Up Form created an account in Pinkett's name at First Citizens at which allotments from his paycheck were automatically deposited. First Citizens then repaid the loan to Norwest Capital from the proceeds of this account. First Citizens charged a $1 fee for each payment that it made. Norwest Capital charged Pinkett a $30 Administrative & Transfer fee to wire transfer the proceeds of the loan to him, which it disclosed as a charge on the Loan Agreement.

Pinkett sued Norwest Capital, alleging that it violated various disclosure requirements of the Truth in Lending Act (Count I), the Electronic Funds Act (Count II), the Illinois Interest Act (Count III), and the Illinois Consumer Fraud Act (Count IV). Pinkett brings only Counts II and IV against First Citizens. Both Defendants have moved to dismiss. Norwest Capital moves to dismiss all but Count III and First Citizens moves to dismiss both counts against it.

Motions to dismiss test the sufficiency, not the merits, of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). The Court treats well-pleaded allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Disability Rights Wise., Inc. v. Walworth County Bd. Of Supervisors*, 522 F.3d 796, 799 (7th Cir.2008). Legal conclusions, however, are not entitled to any assumption of truth. *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss under federal notice pleading, a plaintiff must provide a short and plain statement of his claim that provides "the grounds of his entitlement to relief" by alleging "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (internal quotation marks, brackets, and citation omitted).

While courts usually only consider the contents of the complaint on a Rule 12(b)(6) motion, a court may consider documents that the plaintiff attaches to the complaint. Fed. R. Civ. P. 10(c).

   A.   *Norwest Capital's Motion*

The Truth in Lending Act is a disclosure statute. *Rendler v. Corus Bank*, 272 F.3d 992, 996 (7th Cir. 2001). Rather than regulate the extension of credit, the TILA requires lenders to fairly and accurately disclose the terms and conditions of credit so that consumers can make informed credit decisions. *Id.*; 15 U.S.C. § 1601(a). In that regard, the TILA requires *accurate* disclosures, and lenders can be strictly liable for inaccuracies even when those inaccuracies do not mislead consumers. *Smith v. Cash Store Management, Inc.*, 195 F.3d 325, 328 (7th Cir. 1996).

Pinkett first alleges that Norwest Capital's Loan Agreement and Promissory Note contained numerous inaccuracies that violate the TILA. Pinkett alleges that Norwest Capital: a) did not accurately disclose the number of payments and total amount paid; b) did not accurately disclose the total amount financed because it did not disclose a $30 wire transfer fee as part of the finance charge; c) did not accurately disclose the $1 fee charged by First Citizens as a finance charge; d) miscalculated both the total finance charge and the annual percentage rate because of the inaccuracies stated in b) and c); and e) did not disclose that it took a security interest in Pinkett's personal property.

   1. Number of Payments

The Loan Agreement contains a grid identifying the payment schedule for Pinkett's loan. In that grid, the Loan Agreement states that Pinkett will make 22 payments, each in the amount of $130.87. The Loan Agreement further states that Pinkett will make bi-weekly payments with an initial payment on September 5, 2008 and a final payment due on July 3, 2009. The Loan Agreement states that the finance charge for the $2000 loan is $879.22.

3

Norwest Capital argues that the Loan Agreement "clearly and unambiguously sets forth that the loan would be repaid in 22 bi-weekly payments." If the Loan Agreement did require Pinkett to make 22 payments, each in the amount of $130.87, he would indeed pay $2879.22 to repay the loan. However, if Pinkett made 22 bi-weekly payments beginning on September 5, 2008, the 22nd payment would be due on June 26, 2009, and not July 3, 2009.[2] And yet, the Loan Agreement just as clearly and unambiguously states that a final payment is due on July 3, 2009. Whether the July 3, 2009 payment is a 23rd payment or whether Norwest Capital merely missed a week in its calculations is not clear on the face of the document. The Court will not engage in speculation when resolving a motion to dismiss. The Loan Agreement is ambiguous on its face, and Pinkett states a claim that Norwest Capital did not accurately describe the number and schedule of payments.

2. $30 Wire Transfer and $1 Convenience Fees

Among other things, the TILA requires lenders to accurately state the finance charges in an unitemized total amount. 16 U.S.C. § 1638(a)(3). Norwest Capital did state that the total finance charge was $879.22. Norwest Capital also itemized list of other charges, as required by the TILA. Pinkett argues that the $30 Administrative and Transfer Fee deducted from the amount financed for the wire transfer of credit should have been included in the finance charges and not in the itemized list of other charges.

Norwest Capital argues that it "plainly identifies the $30 wire transfer fee on the list of charges." True, but Norwest Capital did not list the wire transfer fee as a finance charge, but on the itemized

---

[2] The payments would have proceeded as follows: 1) September 5; 2) September 19; 3) October 3; 4) October 17; 5) October 31; 6) November 14; 7) November 28; 8) December 12; 9) December 26; 10) January 9; 11) January 23; 12) February 6; 13) February 20; 14) March 6; 15) March 20; 16) April3; 17) April 17; 18) May 1; 19) May 15; 20) May 29; 21) June 12; 22) June 26.

4

schedule of charges. The mere fact that it listed the fee does not speak to the question of whether that fee is a finance charge. In its reply, Norwest Capital argues that "Regulation Z specifically excludes administrative fees such as the wire transfer and routing fees," citing to 12 C.F.R. § 226.2(a)(25). Section 226.2(a)(25), however, defines the term "security interest," and is not relevant here.[3]

Instead, the Court turns to § 1605, which defines a finance charge as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a). Section 1605 includes an illustrative list of charges that are encompassed within the term, but that list does not include wire transfer fees. 15 U.S.C. § 1605(a)(1)-(6).

Congress delegated to the Federal Reserve Board the authority to prescribe regulations necessary to effectuate the purposes of the TILA. 15 U.S.C. § 1604(a). Given that § 1605(a) does not specifically address whether wire transfer fees should be included as a finance charge, the Court must give the Board's interpretation of the statute in Regulation Z, 12 C.F.R. § 226.4 controlling weight unless it is arbitrary, capricious, or manifestly contrary to the language of the statute. *Household Credit Servs, Inc. v. Pfennig*, 541 U.S. 232, 239, 124 S.Ct. 1741, 154 L.Ed.2d 450 (2004).

Regulation Z identically defines a "finance charge," and like § 1605(a) includes an illustrative list of charges that the Board considers to be finance charges. 12 C.F.R. § 226.4(a)-(b). It also includes

---

[3] Perhaps Norwest Capital meant to refer to 12 C.F.R. § 226.4(c), which lists, among other things, application fees and late-payment fees as examples of fees that are not finance charges. Though these fees might be considered "administrative fees," nothing in Regulation Z "specifically excludes" or otherwise defines administrative fees.

5

an illustrative list of charges that the Board excludes from the term. 12 C.F.R. § 226.4(c)-(e). Both the statute and Regulation Z exclude charges "of a type payable in a comparable cash transaction." Regulation Z further includes as finance charges "[s]ervice, transaction, activity, and carrying charges, including any charge imposed on a checking of other transaction account to the extent that the charge exceeds the charge for a similar account without a credit feature." 12 C.F.R. § 226.4(b).

The wire transfer fee does appears to be just such a service charge. Indeed, Norwest Capital labels it as an "Administrative & Transfer Fee," a charge for the service of for transferring the proceeds of the loan to Pinkett by wire. Thus, Regulation Z would appear to define such a charge as a finance charge *to the extent* that it exceeds the charge that it would charge in a non-credit transaction. Pinkett made no factual allegations about the charges that Norwest Capital imposes upon wire transfers in non-credit transactions, nor would he need to. It certainly is possible that if Pinkett had asked Norwest Capital to wire $2,000 in cash to an account at another bank that it might have charged him $30, in which case the fee appears to fall outside the scope of the definition of a finance charge. The Court, however, cannot resolve that factual issue on this motion to dismiss.

Next, Norwest Capital argues that the $1 fee charged by First Citizens cannot be considered a finance charge. A charge by a third-party is a finance charge if the creditor requires the use of a third party as a condition of or an incident to the extension of credit, unless otherwise excluded. 12 C.F.R. § 226.4(a)(1). Norwest Capital argues that Pinkett's exhibits demonstrate that he "opted" to repay his loan via the allotment system and therefore the third-party charge is not one that it required as a condition of the extension of credit. Norwest Capital points to Exhibit K[4] to suggest that Pinkett could

---

[4] Exhibit K is a list of cases filed by Norwest Capital in the Circuit Court of Cook County. The Court believes that Norwest Capital intended to refer to Exhibit L, a page from Norwest Capital's website explaining how the loan process works.

repay the loan by credit card. Norwest Capital's website does indeed tout that it "also accept[s] credit card payments." However, immediately before that statement, the website informs visitors that "on [their] payment due dates, we [sic] will receive the amount that is owed to us [sic] via allotments." The Frequently Asked Questions section of Norwest Capital's website answer the question of how the loan will be repaid with the statement "[e]ach payment per pay period will be deducted via an allotment." It informs visitors that if they need help setting up payments to contact a customer service representative. The mere fact that an applicant could repay a loan with a credit card *after* receiving the loan does not foreclose the possibility that Norwest Capital required loan applicants to sign up for the allotment system prior to advancing the credit in the first instance. The Court cannot determine from the pleadings and attached exhibits whether Norwest Capital required recipients of the loan to use the postal allotment system, and therefore it cannot answer whether the $1 convenience fee charged by First Citizens should have been included in the total amount financed.[5]

### 3. Security Interest

Norwest Capital next argues that it did not take a security interest in Pinkett's property. The TILA requires that lenders disclose any security interest they take in borrowers' property. 15 U.S.C. § 1638(a)(9). Regulation Z defines a security interest as "any interest in property that secures performance of a consumer credit obligation and that is recognized by State or Federal law." 12 C.F.R. § 226.2(a)(25). When determining whether a lender has taken a security interest in a consumer's property, the court should not elevate form over substance, but instead look to the economic substance

---

[5] Given that the Court rejects Norwest Capital's motion with regard to the $30 wire transfer fee and the $1 fee charged by First Citizens, it need not address its argument regarding whether it stated the annual percentage rate within the statutorily allowed variance.

of the transaction to determine whether the TILA has been violated. *Williams v. Chartwell Fin. Servs., Ltd*, 204 F.3d 748, 753 (7th Cir. 2000).

The Seventh Circuit makes clear that an instrument that grants a creditor rights to collect the debt beyond those contained in the loan agreement must be disclosed as a security instrument. *See Hahn v. McKenzie Check Advance of Ill., LLC*, 202 F.3d 998 (7th Cir. 2000); *Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325 (7th Cir. 1999). In *Smith*, the court noted that Illinois defines a security interest as "'an interest in personal property . . . which secures payment or performance of an obligation.'" *Smith*, 195 F.3d at 329 (quoting 810 ILCS 5/1-201(37)). A security interest, then, gives the lender the right to take or sell the consumer's property in the event of a default. *Id.* *Smith* held that a post-dated check created a security interest because it did more than simply restate the promise to repay the loan, but provided the creditor other remedies, including those created by the Illinois bad check statute, 810 ILCS 5/3-806. *Smith*, 195 F.3d at 329-330.

Here, Pinkett argues that Norwest Capital took a security interest when it obtained an authorization agreement on his checking account and a validation on his credit card. Norwest Capital argues that the authorizations only serve to facilitate the repayment of loans, not to secure repayment upon default, citing to *Cobb v. Monarch Fin. Corp.*, 913 F. Supp. 1164, 1178 (N.D. Ill. 1995). *Cobb*, however, simply is not relevant. In that case, the plaintiff argued that the creditor took a security interest in the account into which allotments from the plaintiff's check were deposited to later be paid to the creditor. *Id.* The account was simply a mechanism to facilitate repayment. That is not the case here. The authorization agreement states specifically that Norwest Capital is authorized to initiate debit entries into Pinkett's personal checking account (not the allotment account), that Pinkett could not terminate the agreement without written notice to Norwest Capital in sufficient time for it to act on their

8

rights, and that any debit to the account that was returned unpaid could be collected in the same manner as an unpaid paper check. The authorization, then, allowed Norwest Capital to debit Pinkett's personal checking account if he reneged on his promise to repay the loan through the allotment system. Norwest argues that Pinkett "would have an opportunity to block [it] from debiting the account," but so too would a plaintiff have an opportunity to block a party from cashing a post-dated check. In either instance, the creditor could pursue remedies under Illinois' bad check statute. From the face of the documents that Pinkett attaches to his Complaint, it is clear that Norwest Capital had the authority to use the debit authorization to Pinkett's account in the event that he defaulted. The Court concludes that Pinkett has stated a claim that Norwest Capital took a security interest in his checking account.

On the other hand, the pre-authorization to his credit card authorized Norwest Capital to hold one payment that would be charged to Pinkett's card upon default. In *Williams*, the Seventh Circuit held that a cash deposit held by the lender was not a security deposit. *Williams*, 204 F.3d at 754. The court observed that the cash deposit did not serve to mitigate the lender's risk upon default by providing it with an alternative avenue to recover its loan from the borrower, but rather served to lessen the overall risk by reducing the amount actually loaned to the consumer. *Id.* The Court finds that the pre-authorization upon Pinkett's card operated in the same way — to reduce the amount at risk, rather than to reduce the risk itself, and therefore did not have to be disclosed as a security interest.

For the foregoing reasons, the Court DENIES Norwest Capital's motion to dismiss Count I of Pinkett's complaint, with the exception of Pinkett's claim that Norwest Capital failed to disclose a security interest in its hold upon Pinkett's credit card.

4. Count II

Norwest Capital next argues that the Court should dismiss Count II of Pinkett's Complaint. Norwest Capital's argument merits little discussion. Pinkett alleges that Norwest Capital violated the EFTA by conditioning the credit upon using the allotment system. In support of its motion, Norwest Capital points to pages from its website that Pinkett attaches to his complaint in which it suggests that alternative payment methods are available. As explained earlier, the mere fact that Pinkett could repay his loan with a credit card *after* receiving the loan does not foreclose the possibility that Norwest Capital required him to sign up for the allotment system prior to advancing the credit in the first instance. The Court DENIES Norwest Capital's motion to dismiss Count II of Pinkett's complaint

5. Count IV

In its reply, Norwest Capital argues that Pinkett abandoned his Illinois Consumer Fraud Act claim. Norwest Capital, however, premised its argument that this claim should be dismissed on its argument that Pinkett had failed to state a claim under the TILA. As the Court has ruled that Pinkett did state a claim under the TILA, Norwest Capital's argument regarding Count IV is without merit and the Court DENIES its motion to dismiss Count IV of Pinkett's complaint.

*B. First Citizens' Motion*

Pinkett alleges that First Citizens violated the EFTA because it "acted in concert" with Norwest Capital. The EFTA states that "no person may — (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k; 12 C.F.R. § 201.10(e). As First Citizens points out, it did not extend Pinkett credit, Norwest Capital did, and so it cannot have violated the EFTA. *See Cobb v. Monarch Fin. Corp.*, No. 95 C 1007, 1996 WL 109624, at *1 (N.D. Ill. Mar. 11, 1996).

Pinkett makes two meritless responses to First Citizens' argument. First, Pinkett seizes upon the word "person" in the language of the statute and argues that the reach of the EFTA is not limited to creditors but to persons. (Pinkett Resp. at 3). Pinkett wholly ignores the *act* which the *person* must engage in — extending credit. Second, Pinkett argues that First Capital "acted in concert" with Norwest Capital. Pinkett argues that numerous factual allegations support his conclusion that First Citizens acted in concert. To the contrary, Pinkett points to only one fact that he believes support his conclusory allegation. Pinkett suggests that the Court should draw an inference that the Defendants acted in concert from the fact that "hundreds of postal employees from Chicago . . . opening accounts at a bank in . . . Kentucky," and closing such accounts once loans are repaid. The Court fails to see how that fact demonstrates any sort of conspiracy or connection between the two defendants.

A pleading must offer more than mere labels and conclusions. *Twombly*, 550 U.S. at 555. Pinkett has invoked only a conclusory allegation that First Citizens and Norwest Capital "acted in concert," that fails to raise his right to relief above the speculative level. The Court GRANTS First Citizens' motion to dismiss Count II of the Complaint against it.

Pinkett's Consumer Fraud Act claim against First Citizens is derivative of his EFTA claim against it. Therefore, the Court GRANTS First Citizens' motion to dismiss Count IV of the Complaint against it.

IT IS SO ORDERED.

5/10/10
Dated

Hon. William J. Hibbler
United States District Court

11